1 | LAW OFFICES OF STEVEN R. FOX
Steven R. Fox, SBN 138808
2 | 17835 Ventura Blvd., Suite 306
Encino, CA 91316
3 | (818)774-3545; FAX (818)774-3707

4 | Attorneys for Debtor-in-Possession

5

6

7

8 | UNITED STATES BANKRUPTCY COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10 | LOS ANGELES DIVISION

11 | In re ) CASE NO: 2:11-bk-11022 BB

12 | JAC Instrument, Co., ) CHAPTER 11

13 | ) MOTION FOR AUTHORITY TO USE CASH COLLATERAL ON AN INTERIM AND FINAL BASIS
14 | Debtor.

15 | ) Date  : To be set
) Time  :
16 | ) Place :

17 | ) First Day Declaration of Henry Shibata Concurrently Filed
18 |
) Petition filed January 9, 2011
19 |

20 | **TO THE HONORABLE BANKRUPTCY JUDGE:**

21 | **COMES NOW** JAC Instrument Co. ("JAC" or "Debtor") with its "Motion for

22 | Authority to Use Cash Collateral on an Interim and Final Basis" ("Motion").

23 | Comerica Bank and other entities appear to hold a properly perfected security

24 | interest in various assets of the Debtor including its monies.

25 | JAC seeks authorization to use its monies to operate its business, to honor

26 | existing and future contracts for work and to do so on an interim basis and then on

27 | a final basis. If JAC cannot use its cash collateral, it would need to cease its business

28 | operation and to let its employees go. JAC's adequate protection offer is discussed

- 1 -

in the Memorandum but it includes an adequate protection payment of $5,000 for Comerica Bank through March, 2011.

JAC requests that it be authorized to use cash collateral as Comerica Bank and any other secured entity are adequately protected in various manners. JAC requests the Court authorize JAC to operate its business pursuant to the proposed budget attached to the Shibata First Day Declaration as **Exhibit "F"** with the various variances and the rollover provision proposed in the Memorandum and also grant replacement liens to the secured parties.

**WHEREFORE** JAC requests that the Court take the following actions:

1. Enter an order authorizing JAC to use cash collateral on an interim basis as per the budget attached to the Shibata First Day Declaration, grant a 20% variance and carry forward provisions and the 75% variance based on increases in costs of goods sold.

3. Set a hearing on final use of cash collateral in the ordinary course of business. At that hearing, JAC will seek authority to use cash collateral in the ordinary course of business and without a requirement it adhere to a specific budget.

4. Approve the request to set aside monies for professionals.

5. Grant to Comerica (and to any other secured party) a replacement lien in property of the estate.

6. Such further relief as the Court deems appropriate and which is consistent with this Motion.

Dated: January 9, 2011            LAW OFFICES OF STEVEN R. FOX

Steven R. Fox, proposed counsel for JAC Instrument Co., Debtor-in-Possession

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR AUTHORITY TO USE CASH COLLATERAL ON AN INTERIM AND FINAL BASIS

1. This case was commenced on January 9, 2011, by the filing of a voluntary petition for relief under Chapter 11 of the U. S. Bankruptcy Code. Since then, the Debtor has been, and continues to be, a Debtor-in-Possession. No examiner or trustee has been appointed and no official committee of creditors has been established.

## I.
### The Debtor's History.

2. JAC imports and sells a broad range of medical products and instruments known as "DME" or durable medical equipment along with incontinence products. DME equipment is equipment which is generally intended for repeated use, serves a medical purpose, is useful to an individual who is ill, has an injury, a functional impairment, or a congenital anomaly, and the equipment can be used in or out of a patient's home. JAC has been in this business for over 31 years. There are many companies selling similar or the same products. Some of the products JAC sells are branded with the JAC name. JAC works to distinguish itself from other competitors with responsiveness to purchasers. Also JAC's products are branded with the JAC name. Larger competitors tend to have higher overhead costs than JAC so their prices tend to be higher than JAC prices. As needed, JAC can offer better financing terms to supply houses and to others than the large competitors will offer. JAC typically has 10 employees including its president Henry Shibata.

3. JAC's financial and legal problems developed over a period of years. The reasons for the chapter 11 filing are discussed in the Shibata First Day Declaration but by the time of this filing, JAC's cash flow was very tight, JAC

1 was unable to pay obligations as they came due and creditors were suing JAC
2 and one had obtained a protective order and a writ of attachment.
3 Terminated management had been making deals to get sales for JAC but the
4 deals caused JAC to sell below its costs. There are serious bookkeeping issues
5 coming to light in the wake of the departure of terminated management. A
6 number of customers face cash flow problems of their own and have slowed
7 down or stopped making payments to JAC.

## II.

### JAC's Financial Condition and the Reorganization.

4. JAC and its assets are fully insured. JAC maintains necessary insurances including general liability, products liability, workers compensation and vehicle policies.

5. <u>Assets</u>. JAC's assets are varied. They include receivables with a stated value of $1,002,707 as of September 30, 2010. Given the problems with the accounting, this number may be lower. Inventory is valued at $408,035 as of December 1, 2010 but this number may not be accurate. There are miscellaneous assets, including a forklift and vehicles valued at $179,450.00 (as of December 29, 2010). JAC has a branded name with years of market recognition. Attached to the Shibata First Day Declaration as **Exhibits "A," "B"** and **"C"** are copies of the following: A balance sheet dated September 30, 2010; an inventory report dated December 1, 2010; and a miscellaneous assets list dated December 29, 2010.

6. <u>Income and Expenses</u>. Attached to the Shibata Declaration as **Exhibit "D"** are the first page of JAC's year 2008 and 2009 federal income tax returns. They reflect $5,972,163 and $5,171.095 in gross sales in years 2008 and 2009. The returns were prepared on the accrual basis. The Debtor's income statement (**Exhibit "E"**) reflects that for the first 9 months of 2010, the Debtor's net sales were $3,302,248. If net sales trends continue for the 4th quarter,

then the Debtor's net sales could amount to $4.4 to $4.5 million. Sales did decrease in year 2010. The decrease was likely do to three problems: (1) former management's action lowering JAC's prices below cost to make sure JAC obtained orders; (2) JAC's cash flow shortages leading to an inability to obtain enough product; and (3) the turmoil which lead to former management's termination in October, 2010. Last week, one creditor obtained a writ of attachment and a temporary protective order against JAC.

7. <u>Liabilities</u>. Given the need to quickly seek relief, JAC cannot file completed schedules with its petition. The Debtor owes in excess of $1,773,000 in unsecured claims. It also owes liabilities include claims by Comerica Bank which likely exceed $950,000. JAC is current in its tax obligations including payroll taxes.

8. Moving forward, the Debtor does not expect to lose money. **Exhibit "F"** to the Shibata First Day Declaration is a true and correct (and unaudited) copy of an internally generated weekly projection of income and expenses going forward.

9. JAC has an ongoing business with established vendor relationships. Its name is branded, recognized and has goodwill. JAC expects to remain in business and reorganize its business affairs. It does not intend to sell its assets or its business but to reorganize its affairs and pay a dividend over time to creditors.

10. JAC can reorganize. It does not intend to sell its assets or its business. JAC intends to propose a plan and pay a dividend to creditors. JAC's core business, sale of DME products is a solid good business. Focusing on this core business will help. Reorganization is possible in part because JAC is a branded name with good recognition. Mr. Shibata discusses the steps JAC will be taking to improve its management and to reorganize. This include the following. Replacing management in late October, 2010 was a first step to reorganizing. JAC has brought in new personnel to assist Henry Shibata. They are busy working trying to create financial records. JAC has changed its

commission structure one more in line with what JAC can afford. JAC will not honor former management's decisions to sell products for less than JAC's costs. JAC will reduce expenses where possible. JAC will examine how it can collect its receivables more efficiently and quickly. Part of this process may be to cut off very slow paying customers. JAC will make other changes that may be appropriate to reorganize.

11. Some creditors appear to assert security interests in the Debtor's monies. Information about each creditor can be found in the Shibata First Day Declaration and at Exhibit "G" to that Declaration. These creditors are Comerica Bank, possibly Invacare Corporation, Key Equipment Finance (two financing statements), PNCEF, LLC., and VGM Financial Services, a division of TCF Equipment Finance.

### III.

### Request for Authority to Use Cash Collateral.

12. JAC requires the use of cash collateral in order to operate its business, to pay employees, to pay rent and utilities, and to honor existing (and future) product orders. Without the use of cash collateral, JAC will be unable to remain in business. If JAC cannot use the cash collateral, its reputation in the industry will be severely harmed and the value of its branded name will also be affected. Authorizing the relief requested below will benefit the secured parties as the use of cash collateral will protect their security. If their security interests extend to all of JAC assets, then JAC does not have unencumbered sources of monies or other assets to pay ordinary course of business obligations.

13. <u>Interim Use</u>. JAC requests that it be authorized to use cash collateral on an interim basis as per the budget ("budget") attached as **Exhibit "F"** to the Shibata First Day Declaration. The budget is based on JAC historical income and expenses information and also on JAC beliefs as to how

1  income and expenses will change in the near future. The budget is
2  unaudited. The budget also includes a cash flow analysis. The cash flow
3  analysis assumes that JAC has no funds on hand as of the filing date which
4  is not the case. As of January 7, 2010, JAC had approximately $7,000 on
5  hand. JAC management has made assumptions concerning short term
6  income and expenses which are reflected in the projections.

7  14.  <u>Variance</u>. Budgeting is not an exact science and depending on the number
8  of orders JAC may receive in the period of time before the final hearing,
9  JAC requests that it be permitted to vary from the budget above by as much
10 as 20% in any one category. In the event that JAC determines that it will
11 need to vary from any one budgeted item by more than 20%, then JAC
12 proposes that it provide written notice by email or telecopier of the variance
13 to Comerica Bank and if Comerica does not object to the variance within
14 48 business hours, then the variance will be deemed approved. In the
15 event Comerica objects, then JAC will seek to hold a hearing on shortened
16 notice to resolve the dispute.

17 15. <u>Applying Collection Overages to Costs of Goods Sold</u>. When following a
18 budget in chapter 11, one frequent problem is that a debtor's sales will
19 increase faster than the approved budget will permit that debtor to
20 purchase product. This means the debtor has the orders on hand but must
21 wait until a future week when it has monies in the budget to purchase the
22 products. On occasion, orders can be back logged for weeks at a time.
23 This hurts a reorganization as shipments are delayed or work is turned
24 away. Therefore, JAC requests that it be permitted to use as much as 75%
25 of the positive cash collections variance (in other words collected cash
26 above that which is projected to be received) to be used toward increases in
27 JAC' cost of goods sold budget. By permitting this, JAC can take excess
28 monies collected and apply the monies to purchase more products. This

1     increases the asset base and also helps the business reorganize.

2  16.   **Rolling Unspent Expenses Forward**. The budget is a weekly budget. It is likely JAC will underspend in certain categories in some weeks. JAC requests that the Court authorize the Debtor to carry over from previous weeks any unused monies to be used in the same categories in future weeks. JAC also requests that the monies carried forward not count toward the 20% variance.

17.   **The Secured Parties Are Adequately Secured**. Section 361 defines "adequate protection" in various manners including periodic payments to the secured creditor, replacement liens and other relief. Comerica is afforded adequate protection of its claim in many ways.

    a.     Its claim amount is perhaps $950,000.00. The value of the assets discussed above is one form of adequate protection as the value of the assets exceeds the amount of money Comerica is owed.

    b.     The security will continue to be protected and preserved as JAC continues to operate and the assets of the business are maintained and serviced.

    c.     JAC' business is continuing to generate additional revenues creating further value for Comerica's claims.

    d.     All assets are adequately insured.

    e.     JAC proposes the Comerica (and the other entities holding liens) be granted a replacement lien in the assets of the estate to the extent that its prepetition liens attached to property of JAC with the same validity, priority, and description of collateral.

    f.     JAC will provide monthly reports to Comerica in the form of a monthly P&L (accrued based), a comparison of budgeted to

actual spending (cash based), a receivables report and a payables report, all due by the 15th of the following month.

 g. JAC proposes to pay $5,000 to Comerica during the week ending February 11, 2011 and to make the same payment on a monthly basis thereafter pending a different order of the Court.

18. Comerica may assert that it should be paid more than the proposed $5,000 monthly payment. However, the purpose of paying adequate protection is not to protect a secured creditor at the moment; it is

to ensure that the secured creditor ultimately receive[] what it would have received had not bankruptcy intervened. "'Although stripped of the right to immediate possession of its property, the creditor receives assurances that the value it could have received through foreclosure will not decline.'" In re ProAlert, 314 B.R. at 441-42 (quoting 3 James F. Queenan,*327 Jr. et. al, Chapter 11 Theory and Practice § 16.03 (1994)).

In re Las Vegas Monorail Co., 429 B.R. 317, 326-327 (Bankr. D.Nev. 2010)

19. <u>Final Use of Cash Collateral</u>. JAC requests that the Court set a hearing on final use of cash collateral and, at that hearing, authorize JAC to use cash collateral in the ordinary course of business.

20. <u>Professional Fees</u>. Prepetition, JAC counsel was paid a retainer. This case is a difficult case. The retainer is likely will be used up in the next few months. Pursuant to <u>In ProAlert</u>, 314 B.R. 436 (Bankr. 9th Cir. B.A.P. 2004), JAC seeks authority to use cash collateral to pay legal fees which exceed the retainer amount. If approved, JAC would, later in the case, set aside monies monthly and designated for this purposes into a separate bank account. Counsel, after his retainer was drawn down, would make an application for compensation from the monies deposited in the separate bank account. During the case, JAC will replenish the monies in the account. The monies would not be withdrawn under the U.S. Trustee's draw-down procedure absent order of the Court.

21. JAC does not have an accountant. As funds permit, JAC will be moving the Court to permit JAC to retain an accountant and to pay a post-petition retainer to the accountant.

22. Section 361 defines "adequate protection" in various manners including periodic payments to the secured creditor, replacement liens and other relief. Comerica is afforded adequate protection of its claim for many reasons, e.g., the security interest in personal property which have substantial value, any adequate protection payment the Court may order, the ongoing operation of the business and generation of new receivables, and maintenance of insurance. Payment of professional fees as proposed here enhances the estate's ability to reorganize which also provides further adequate protection to Comerica .

23. <u>Insiders' Compensation</u>. The budget provides for compensation for insiders but JAC will not pay insiders pending either an order of the Court or the successful completion of the insider compensation request process utilized under the U.S. Trustee's Guidelines

24. <u>Waivers and Cash Collateral Stipulation Form 4001-2; Notice</u>. There is no stipulation for the use of cash collateral. There are no provisions in the Application that are referenced in Official Form 4001-2. JAC is not here waiving (1) any right to dispute the validity of any lien, (2) to challenge whether particular assets are subject to a security interest, (3) to invalidate a security interest, (4) to surcharge collateral or (5) to maintain any claims that JAC may have against any entity asserting a secured claim against any assets of the estate.

25. Upon receiving a hearing date from the Court, the Debtor will serve the Motion on the U.S. Trustee, Comerica and on the 20 largest unsecured creditors. Notice will be provided to the entire creditor body.

## VII.

## Conclusion

JAC requests that the Court take the following actions:

1. Set an immediate hearing on this Application.
2. Enter an order authorizing JAC to use cash collateral on an interim basis as per the budget attached to the First Day Declaration, grant the 20% variance and carry forward provisions and the 75% variance requested above.
3. Set a hearing on final use of cash collateral in the ordinary course of business.
4. Approve the request to set aside monies for professionals.
5. Grant to Comerica (and to any other secured party) a replacement lien in property of the estate as discussed above.
6. Such further relief as the Court deems appropriate and which is consistent with this Application.

Dated: January 9, 2011          LAW OFFICES OF STEVEN R. FOX

_____
Steven R. Fox, proposed counsel for
JAC Instrument Co., Debtor-in-Possession